## SALE OF OLEOMARGARINE AT RETAIL.

[Circuit Court of Lucas County.]

VERNON M. WILLIAMS v. THE STATE OF OHIO.*

.Decided, March 1, 1902.

*Oleomargarine—Statute Governing the Sale of as Butter—Proprietor of Store Responsible for Violation of by a Clerk—Notwithstanding Directions to the Clerk—Trial—Evidence.*

1. Where an affidavit charges one with unlawfully selling oleomargarine, and the evidence shows that the sale was made by an employe who was authorized to sell the article, this is not a variance. It was not necessary to allege that the sale was made by an agent or employe. In misdemeanors all are principals.

2. In a prosecution for selling oleomargarine as butter, in violation of Section 4200-17, Revised Statutes, where the oleomargarine was sold by a clerk in the store of the accused, who was engaged in the business of selling oleomargarine to the public, with other merchandise, and who authorized its sale by his clerks, in the ordinary course of business, it is no defense that he had instructed such clerk and all of his clerks in the store not to sell eleomargarine, except under its true name and marked and labeled as required by said act; and testimony to prove such instructions was properly excluded.

3. One who engages in the business of selling oleomargarine to the public and permits and authorizes its sale by his clerks or employes, is bound to see that the law regulating its sale is complied with, and if it is violated by such employes or clerks, the employer is liable under the statute.

HULL, J.; HAYNES, J., concurs; PARKER, J., dissents.

The plaintiff in error was prosecuted under Section 4200-17 of the Revised Statutes, which is one of the sections providing against the sale of adulterated foods and drugs. This section prohibits the sale of oleomargarine except under its true name and when properly marked and stamped. The defendant was tried before a justice of the peace, or city judge of the city of Toledo as he is called, and a jury, and found guilty. A motion for a new trial was filed and overruled, and a fine of $50 and

* Affirmed by the Supreme Court, without report, January 12, 1904.

costs was imposed upon the plaintiff in error. It was to reverse this judgment that proceedings in error were brought in the court of common pleas and in this court. The judgment of the justice of the peace was affirmed by the court of common pleas; and it is sought here to reverse the judgment of both courts below.

After providing in Section 4200-13 against manufacturing articles in imitation of butter and cheese, and in 4200-15 for a penalty, 4200-16 provides that:

"No person shall manufacture, offer or expose for sale, sell or deliver, or have in his possession with intent to sell or deliver, any oleomargarine, which contains any methly (methy) organe, butter yellow, annatto, analine dye, or any other coloring matter."

Section 4200-17, under which this plaintiff in error was prosecuted, provides as follows:

"Every person who shall offer or expose for sale, sell or deliver, or have in his possession with intent to sell or deliver, any oleomargarine, shall keep a white placard not less in size than ten by fourteen inches, in a conspicuous place where the same may be easily seen and read, in the store, room, stand, booth, vehicle or place where such substance is offered or exposed for sale, on which shall be printed in black letters, not less in size than one and one half inches square the words 'oleomargarine sold here,' and said placard shall not contain any other words than the ones described; and no person shall sell or deliver any oleomargarine unless it be done under its true name and each package has on the upper side thereof a label on which is printed in letters not less than five-eighths of an inch square the word 'oleomargarine' and in letters not less than one-eighth of an inch square the name and per cent. of each ingredient therein."

The plaintiff in error was charged with a violation of the provision contained in the latter part of this section, which provides that "no person shall sell or deliver any oleomargarine, unless it be done under its true name, and each package has on the upper side thereof a label on which is printed," etc. The affidavit charged the defendant below with selling oleomargarine personally; it did not charge that he did it through a clerk or agent, but simply charged that Williams—

"* * * did unlawfully sell to one Myra Heisey, also of said county of Lucas, a quantity of oleomargarine, the same being then and there a substance not pure butter, containing less than eighty (80) per cent. of butter fats, towit, eight and three hundredths (8.03) per cent. butter fats, which said substance was then and there made as a substitute for, in imitation of, and to be used as butter; that then and there said oleomargarine was not sold under its true name; but was then and there sold as, for, under and by the name of butter; contrary to the form of the statute in such case made and provided and against the peace and dignity of the State of Ohio."

The evidence in the case showed that if a sale was made, it was made by a person in the employ of the plaintiff in error, and not by him personally; and it is claimed that this constitutes a variance between the evidence and the affidavit.

The offense provided for in this section is a misdemeanor, not a felony, and all parties to the commission of the offense are principals. In the case of *Anderson* v. *The State*, 22 O. St., 305 (an intoxicating liquor case), the indictment charged Anderson, the defendant below, with the sale of liquor personally; the evidence showed it was sold through an agent. On page 308 of the opinion the court say:

"Strictly speaking, the legal relation of principal and agent does not exist in regard to the commission of criminal offenses. All who participate in the commission of such offense, are either principals or accessories. In offenses less than felony, all are principals."

In the case of *The State* v. *Basserman*, 54 Conn., 88, referring to a liquor statute, the court say:

"Under that statute a delivery by an agent is in all respects the same as a delivery by the vendor himself."

Section 4200-17, makes no express provision for the sale through an agent or servant, as is done in some statutes; but simply provides generally that "no person shall sell or deliver," etc. If the oleomargarine was sold by a clerk or employe of Mr. Williams, with his authority, the sale then would be made by him, the same as though he had made it personally, and, in our judgment, the affidavit is sufficient, and there was

no substantial variance. It was not necessary to allege that the sale was made through an agent. There is a common pleas decision in this state that holds otherwise; but there are no authorities cited in that decision, and the judge finally found that the evidence was not sufficient to warrant conviction in any event.

The chief question in this case is, whether, if the oleomargarine was sold by the authority of the defendant below, through a clerk, it would be a defense for him to show that he had given directions and instructions to this clerk, and to all of his clerks, not to sell oleomargarine except under its true name, and unless stamped and marked as required by law.

The defendant below offered to testify that he had given such directions; upon objection being made by the state, he was not permitted to do so, but the objection was sustained and the testimony excluded; and the case as finally submitted to the jury, under the charge of the court, excluded from their consideration anything of this kind. It is urged by counsel for the plaintiff in error that there can be no criminal intent, no conviction of a criminal offense of any kind, where the defendant himself has not been a party to the offense, where he has not knowingly committed any offense personally, and in this case it is claimed, and it was offered to show that he had given instructions to his employes not to sell the oleomargarine, except according to the provisions of this statute.

On the other hand, it is urged by the state that under a statute of this kind and similar statutes providing against the sale of adulterated foods and drugs, one who authorizes another to sell is bound to know that the law is being complied with by his agent and employe, and that it would have been no defense for Mr. Williams to show that he had given instructions— private instructions to his clerk not to sell oleomargarine except in accordance with the law—that if, in fact, it was sold from his store, sold there by his authority, he would be guilty of a violation of this statute, if sold contrary to its provisions by the clerk, notwithstanding his instructions.

Questions similar to this have arisen more often perhaps in prosecutions under statutes providing against the sale of in-

toxicating liquors than in any other class of cases; but the Supreme Court of this state has had before it some cases arising under the food laws, where they have laid down certain principles, which we think control this case, although no case exactly like this has been before the Supreme Court.

In the case of *The State* v. *Kelly,* 54 O. S., 166, the defendant was charged with selling adulterated food; he sought to show in his defense that he had no knowledge that the food was adulterated, but believed it to be pure, and sold it in good faith; and in the trial before the justice of the peace, this instruction was requested—

"While it is not necessary to charge knowledge in the affidavit, want of knowledge and absence of intent is a valid defense. You will carefully weigh the evidence of all the witnesses, and if the evidence discloses that the defendant bought the molasses he is charged here with selling for pure New Orleans molasses and honestly believed it to be such, that still believing it to be pure he sold it as such without intent to deceive the purchaser thereof as to its true character, you must acquit the prisoner."

This instruction was refused and upon Kelly's conviction the case was taken on error to the common pleas court and the judgment reversed there and the case went to the Supreme Court on exception to the reversal, and the exception was sustained. The Supreme Court say in the syllabus of the case:

"1. An affidavit to charge a violation of the act of March 20, 1884, Section 8805 (Giauque's Revised Statutes), 'to provide against the adulteration of food and drugs,' need not charge that an adulterated article of food is sold to be used as human food.

"2. In a prosecution under said act, it is not a defense that the accused is ignorant of the adulteration of the article which he sells or offers for sale."

Judge Shauck, in delivering the opinion of the court said:

"The first section of the act of March 20, 1884 (Section 8805, Revised Statutes), provides 'that no person shall within this state manufacture for sale, offer for sale, or sell any drug or article of food which is adulterated, within the meaning of this act.' Other provisions of the statute are devoted to definition

of the terms used in the first section, and to prescribing penalties for the violation of the act. It is not doubted that molasses to which glucose has been added is an article of adulterated food within the meaning of this statute.

"The act does not in terms require, to constitute an offense against its provisions, that the adulterated articles of food shall be sold to be used by the purchaser as human food. Nor does it in terms require, as an element of the offense, knowledge of the fact that the article is adulterated, or provide that a want of such knowledge shall constitute a defense. Both conclusions stated in the decision of the court of common pleas are, therefore, wrong, unless there are justifiable inferences from the purpose and indicated policy of the act.

"The act is not a provision for the punishment of those who sell adulterated food or drugs, because of any supposed turpitude prompting such sales or indicated by them. Its purpose is indicated by its title. It is 'an act to provide against the adulteration of food and drugs.' It is a plan devised by the General Assembly to protect the public against the hurtful consequences of the sales of adulterated food and drugs, those consequences being in no degree increased by the vendor's knowledge, or diminished by his ignorance, of the adulteration of the articles which he offers for sale. The provisions of the act are appropriate to the purpose, indicated by its title. It would have been inconsistent with that purpose to provide for the trial of such immaterial issues as the object of the vendor in making a sale or of the extent of his knowledge touching the quality of the article sold. Those who produce the adulterated articles whose sale is forbidden may live without the state. Purpose and knowledge, except when they are indicated by the character of the forbidden act, are, in most cases, insusceptible of proof. If this statute had imposed upon the state the burden of proving the purpose of the vendor in selling an article of food or his knowledge of its adulteration, it would thereby have defeated its declared purpose. Since it is the duty of courts to so construe doubtful statutes as to give effect to the purpose of the Legislature, they can not in case of a statute whose provisions are unambiguous and whose validity is clear, defeat its purpose by construction.

"The correct view of statutes of this general nature is stated by the Supreme Court of Massachusetts in *Commonwealth* v. *Murphy*, 42 N. E. R., 404: 'Considering the nature of the offense, the purpose to be accomplished, the practical methods available for the enforcement of the law, and such other matters as throw light upon the meaning of the language, the question

in interpreting a criminal statute is whether the intention of the Legislature was to make knowledge of the facts an essential element of the offense, or to put upon everyone the burden of finding out whether his contemplated act is prohibited, and of refraining from it, if it is.' ''

In the last paragraph of the opinion Judge Shauck says:

''In the enactment of this statute it was the evident purpose of the General Assembly to protect the public against the harmful consequences of the sales of adulterated food and drugs, and, to the end that its purpose might not be defeated, to require the seller at his peril to know that the article which he offers for sale is not adulterated, or to demand of those from whom he purchases indemnity against the penalties that may be imposed upon him because of their concealment of the adulteration of the articles.''

The doctrine of this case, at first blush, might seem to be in conflict with the general principles of criminal law— that one might be convicted of an offense where he had no criminal intent or purpose and no knowledge at the time that he was violating a law. But the rule seems to be, as laid down by the Supreme Court, that one who sells food is bound to know that he is not violating these statutes for the protection of the public against the adulterating of foods, and as the court say in the concluding paragraph, it was the purpose of the General Assembly to require the seller at his peril to know that the article which he offers for sale is not adulterated.

But this doctrine of our Supreme Court was by no means a new doctrine, and it has been so held in many states. In the case of *Commonwealth* v. *Savery,* 145 Mass., 212, it is said:

''It is no defense to a complaint for keeping intoxicating liquors with intent unlawfully to sell the same, that the liquors were upon the defendant's premises by mistake, and he did not know they were intoxicating, if he intended to sell them, and they were in fact intoxicating.''

In this case the defendant was a liquor seller; he was not permitted under the statute of Massachusetts to sell beer containing more than three per cent. of alcohol. It is claimed that he sold by mistake beer containing more than three per cent.

of alcohol, without knowledge that it contained more alcohol than the statute permitted; but the Supreme Court of Massachusetts held that that was no defense, he was bound to know it, "at his peril."

The case of *Commonwealth* v. *Wentworth,* 188 Mass., 441, is a case where a man was prosecuted for keeping for sale naphtha under a false name. His defense was that he did not know that the article which he had was naphtha, he supposed that it had none of the dangerous qualities of naphtha; but the court said in that case:

"We are of opinion that the court correctly ruled, that the question whether the defendant had knowledge that the articles kept by him was naphtha was immaterial. The statute does not make a guilty knowledge one of the ingredients of the offense. It is like the statutes against the sale of intoxicating liquors, or adulterated milk, and many other police regulations; it prohibits the acts of selling or keeping for sale naphtha under any name, not because of their moral turpitude, or the criminal intent with which they are committed, but because they are dangerous to the public."

The case of *Commonwealth* v. *Farren,* 9 Allen, 489, was a milk case. The Supreme Court of Massachusetts in that case say:

"A person may be convicted of selling adulterated milk, under St. 1864, C. 122, Section 4, although he did not know it to be adulterated, and an averment in the indictment that he had such knowledge may be rejected as surplusage."

*The State* v. *Hartfield,* 24 Wis., 60, was an intoxicating liquor case, and is perhaps in conflict with some of the former decisions of our own Supreme Court in cases of selling intoxicating liquors to a minor. The Supreme Court of Wisconsin holds:

"The sale of intoxicating liquors to a minor is an offense under Section 1, Ch. 128, Laws of 1867, though the vendor does not know that the purchaser is a minor."

The evidence in the case was that the defendant inquired of the purchaser his age, and it was represented that the person was of full age; he was in fact six feet and one inch in height, and defendant believed in good faith that he was of age. But

the Supreme Court of Wisconsin held that was no defense; that he was bound to know.

It is urged that to hold here that Mr. Williams might be convicted although he had given directions to his clerk not to sell except in accordance with the law, would be contrary to the former decisions of the Supreme Court of this state, especially in liquor cases, and particularly a case in the 22d O. St., where it was held by the Supreme Court that that constituted a defense in case of selling liquor. The Supreme Court, however, in the case of *The State* v. *Kelly,* 54 O. St., 166, seem to have had no difficulty in discriminating between the rules that had been laid down in liquor cases and the rules that ought to be laid down in the case of selling adulterated food. There is this to be said in liquor cases the law provides that the penalty for a violation of the statutes may be imprisonment, as well as a fine, and a violation of the food statute is punishable by a fine only. It provides that whoever violates any one of the provisions of the statute shall pay a fine of $50. Whether that makes any difference in the rule it is not necessary to determine. The Supreme Court, however, in the case in the 54th O. St., hold clearly and positively that lack of knowledge is no defense in a prosecution under this statute for selling adulterated food; and that was as much in conflict with the former holdings of the Supreme Court upon that question in liquor cases, if there is any conflict, as it would be to hold that a vendor of oleomargarine, who sold it through his clerk, contrary to his instructions, would be liable under this statute, if the clerk did not comply with the law. The Supreme Court has held in many cases of selling intoxicating liquor that want of knowledge is a defense, tracing the doctrine back to the old case in the 8th Ohio, page 230 (*Birney* v. *The State of Ohio*), where a person was prosecuted for concealing a slave, and his defense was that he did not know that the mulatto was a slave.

In the case of *Miller* v. *The State* in the 3d O. St., 476, the Supreme Court held in a liquor case, in the syllabus as follows:

"To convict of a violation of the second section, it is necessary to aver in the information and prove on the trial that the seller knew the buyer to be a minor; and to convict of a

violation of the third section, it is necessary to aver and to prove, in like manner, that the seller knew the buyer to be intoxicated, or in the habit of getting intoxicated.''

The case of *Crabtree v. The State,* 30 O. St., 382, was another case of selling to a minor, where it was held that want of knowledge was a defense. This is in the syllabus:

''In prosecutions under Section 3 of the act 'to provide against the evils resulting from the sale of intoxicating liquors in the state of Ohio' defendant may show, to rebut proof of knowledge, by his own and other persons' testimony, that shortly prior to the time of the alleged unlawful sale he made inquiry of persons well acquainted with the person charged in the indictment as a person in the habit of getting intoxicated; and also show what information he obtained from such persons. His good faith and due care in seeking and obtaining such information, as well as the proper effect thereof under all the circumstances, are to be left with the jury.''

On page 387 of the opinion, the court quotes from Mr. Bishop as follows:

'' 'And when this good faith and this due care do exist, and there is no fault or carelessness of any kind, and what is done is such as would be proper and just were the fact what it is thus honestly believed to be, there is no principle known to our criminal jurisprudence by which this morally innocent person can be condemned because of the existence of a fact which he did not know and could not ascertain. On the other hand, to condemn him would be to violate those principles which constitute the very foundation of our criminal jurisprudence. Honest error of a fact is as universal an excuse for what would be otherwise a criminal act as insanity.' ''

And in the case of *Farrell v. The State,* 32 O. St., 456, a liquor case, a man was charged with selling intoxicating liquor, and his defense was that he did not know it was intoxicating liquor, that he bought it under the name of bitters, supposing it was a harmless compound, and that it contained no alcohol, it was so represented and sold to him, he kept it honestly and sold it honestly believing it to be non-intoxicating, just as in the 54th O. St., the party sold the food, believing it to be pure; and the Supreme Court held in that case that that would be a

good defense; the second paragraph of the syllabus is as follows:

"A person indicted for selling intoxicating liquors, in violation of the provisions of Section 1 of the act to prvide against the evils resulting from the sale of intoxicating liquors in the state of Ohio, may, on the trial, show that at the time he bought the articles it was represented to him to be free from alcoholic properties—that he bought it with the understanding and believing that it was not intoxicating liquor, and sold it with such understanding and belief."

The question is discussed at some length. In the opinion the court say:

"The accused interposed two defenses—first, that the bitters sold was free from alcoholic properties; and, second, that if the bitters did, in fact, contain alcohol, and was intoxicating by reason thereof, he was wholly ignorant of such fact; that he bought the bitters upon information and in the belief that the bitters was free from alcoholic properties, and sold it free from all intention of violating the statute."

And further on page 460:

"We are unable to see why the proposed testimony was not competent. The accused's intention at the time of the sale was involved in the issue. It was competent to show that, from the circumstances of the case, he was free from culpable purpose, and one of the circumstances tending to show freedom from guilty intention in the sale was the fact, if fact it proved to be, that he bought the bitters under the information and belief that it was an article free from alcoholic properties; that he sold it honestly believing, from information obtained at the time of the purchase, that it was not an intoxicating liquor. We think the testimony would have tended to show good faith and want of guilty intention on the part of the accused."

I have called attention to these former decisions of the Supreme Court for the purpose of showing that when they came to construe and interpret this food law in the 54th O. St. they did not apply those rules, nor any such principles as are laid down in the last case from which I have read. But they held that under the statute which prohibits the sale of adulterated food or drugs, the seller of such articles sold them at his peril, and that the burden was upon him to ascertain whether they

were pure or not; although in the case just cited, 32 O. St., 456, the court held that it constituted a good defense in a liquor case for the vendor to show that he did not know that the article he was selling was intoxicating liquor. The liquor case in the 22d O. St., p. 5, it is urged should control this case. The syllabus of that case is as follows:

"Where, in a prosecution for unlawfully selling intoxicating liquor, it appears by the evidence for the state that the sale was made by the agent of the defendant in charge of the establishment where the liquor was sold, it is competent for the defendant to rebut the presumption of *prima facie* agency, which the evidence makes against him, by showing that the sale was, in fact, made without his authority and against his directions.

"2. But the directions to the agent, forbidding the sale, must be in good faith; for however notorious or formal they may be they can have no effect, if they are merely colorable. The fact of agency is to be determnied by the *real understanding* between the principal and agent."

And in the opinion on page 308, the court say:

"The rule as to the conclusive effect of the *prima facie* or apparent authority of an agent ought not to be applied to the enforcement of a criminal statute where such statute is fairly susceptible of a different construction. The accused, in such case, has the right to rebut the presumption of *prima facie* agency, which the evidence makes against him, by showing, if he can, that the criminal act was, in fact, committed without his authority and against his instructions."

To hold that Williams was liable for what his clerk did contrary to instructions would appear perhaps to be in conflict with this decision; but it seems to us that it would be no more in conflict with the holding in that case than the decision of the Supreme Court in the 54th O. St. was with some of the former decisions in liquor cases. But the Supreme Court decided that case without citing or attempting to reconcile the decision with the former decisions of the court in liquor cases. They there laid down the broad doctrine that these food statutes are for the protection of the public, and that it is wholly immaterial to the public whether the seller had knowledge that the food was adulterated or not. The statute does not provide

against one willfully and knowingly selling adulterated food, but it provides absolutely against its sale, and the Supreme Court say that the question of knowledge is immaterial and suggest that to hold otherwise would interfere very materially with the practical enforcement of the statute and say that a court ought, where it can do so, to construe and interpret a statute in such a way that it may be enforced in a manner to carry out the purpose and object of the Legislature.

I will refer to another case which tends to support the contention of the plaintiff in error (*Barnes* v. *State*, 19 Conn., 397), in which the court say:

"Where it appeared in such prosecution that the sale complained of was made by the clerks of the defendant, and he offered evidence to show that he had given such clerks specific directions to sell no liquors to common drunkards, it was held that such evidence was admissible."

I will say that this was also an intoxicating liquor case. It was decided by a divided court, two judges of the five, Chief Justice Church and Judge Waite, dissenting from that proposition of the syllabus.

The record in the case at bar shows that Mrs. Hisey, the purchaser of this article, went into Mr. Williams' store, called "the Adams Street Butter Market," one evening between 9 and 10 o'clock; she found a young man behind the counter, dressed as a clerk, with a large apron on; she called for a pound of butter; he went back into the room to a large refrigerator, or some such apartment, and brought out a roll of something that looked like butter. It was a trifle over a pound, very little, and he charged her thirty cents for it. The price of oleomargarine at that time was but fifteen cents a pound. It was not stamped nor marked, but was sold to her as butter. The evidence in the case further shows that the oleomargarine was colored to look like butter, in violation of another section of the food laws. This young man was selling goods in the ordinary way. The next morning she undertook to use some of the commodity she had purchased and discovered it was not butter, but oleomargarine. She thereupon complained to the authorities, and the deputy commissioner of the dairy and food department went to

the store a few days later, and this same young man was found behind the counter selling goods. The analysis of the article showed that it contained eight per cent. of butter fats, instead of eighty per cent., as required by law.

The defendant testified that this young man had no authority to sell anything. This question, with the other questions of fact, was left to the jury; and there was ample evidence to warrant the jury in finding that he did have authority to sell. The defendant admitted upon the witness stand that he did not reprimand the young man for selling Mrs. Hisey oleomargarine upon the occasion in question; he said that he had a cashier and perhaps one more clerk besides this young man, and offered to show that he had given them all instructions not to sell oleomargarine except in accordance with the statute. This evidence was excluded. Mr. Williams' testimony sheds some light on the way this business was carried on, or was in this particular case, at least. According to his testimony, he purchased this oleomargarine from another person under a contract that the dealer from whom he purchased it would pay all fines and costs that might be imposed upon Mr. Williams and employ counsel for him in case of trouble, and defend any prosecutions that were commenced against him. While that perhaps does not shed very much light on the question involved here, it indicates that it was contemplated by the parties that there would probably be criminal prosecutions. The evidence shows, as I have suggested, that the oleomargarine was colored so as to look like butter.

The question is, whether, if it were shown that Williams had given private instructions to his clerks not to sell oleomargarine except according to law, that would constitute a defense. A majority of the court are of the opinion that it would not, and that this testimony offered was properly excluded. If this oleomargarine was sold by a duly authorized clerk, it was a sale by Mr. Williams, as much as if it had been sold by him. He was engaged in the oleomargarine business, although his place of business was called a "butter market." He knew, of course was bound to know, what the provisions of this statute were. We think that this case is within the principles laid down by the Supreme Court in the Kelly case, 54 O. St., 166.

When a man offers oleomargarine for sale in his store in the open market, along with butter, or otherwise—an adulterated article of food, the sale of which is prohibited, except upon certain conditions—the duty is imposed upon him to see that the laws of the state are complied with. He may sell it and attend to the matter of sale himself, if he sees fit; but if he prefers to leave it to clerks or others whom he employs, he does so at his peril; and if the provisions of these sections of the statute are violated, he must suffer the penalty imposed by law. These provisions are in the nature of police regulations, as the Supreme Court has said, for the protection of the public. This statute should be so construed by the courts as to admit of its practical enforcement. To hold that by private instructions to a clerk a person in the oleomargarine business might escape prosecution or punishment, would go a long way, it seems to us, toward destroying the beneficial effects and purposes of this law. In many cases such goods are ordered by telephone, and the clerk is not seen; there is no way of identifying him. We think it is not imposing an extraordinary hardship upon one who engages in selling adulterated food, to require him to see, at his peril, that the law of the state is complied with. Where the article is sold by his authority, it is not like a case where a party has prohibited his clerks from selling the article at all, or where the clerk without any authority has sold the article, or where some one has come into his store without authority and sold the article. But here is a case where the party is engaged in the business of selling, where he intends to sell it, and where his clerks are authorized and employed to sell it.

A paragraph from Greenleaf on Evidence, we think is in point (Vol. 3, p. 21); I will read a portion of it:

"But where a statute commands that an act be done or omitted, which, in the absence of such statute, might have been done or omitted without culpability, ignorance of the fact or state of things contemplated by the statute, it seems, will not excuse its violation. Thus, for example, where the law enacts the forfeiture of a ship having smuggled goods on board, and such goods are secreted on board by some of the crew, the owner and officers being alike ignorant of the fact, yet the forfeiture is incurred, notwithstanding their ignorance. Such is

also the case in regard to many other fiscal, police, and other laws and regulations, for the mere violation of which, irrespective of the motives or knowledge of the party, certain penalties are enacted; for the law in these cases seems to bind the party to know the facts and to obey the law at his peril.''

We think in holding as we do, we are following the principles and spirit of the case in the 54th O. St. In the absence of a decision directly in point, we are of the opinion it ought to be the law, and we hold it to be the law, that where one engages in a business of this kind, he does it at his peril, and that the duty is imposed upon him to *know* that those whom he employs to sell this article to the public obey the law in the manner of selling it, and in case they do not, that he, as the principal and proprietor of the establishment, is liable to pay the penalty assessed by the statute. We feel that any other holding would practically destroy this statute and thwart the object and purpose that the Legislature had in view. We believe it to be a wholesome law and that it should be construed so that it may be enforced.

The judgment will be affirmed.

*Chittenden & Chittenden,* for plaintiff in error.

*Walter Brown,* for defendant in error.


PARKER, J., dissenting.

As indicated in the opinion delivered by my associate, we are not in accord on one proposition involved in this case. The defense, or one of the defenses attempted to be established by the evidence was fairly stated by Judge Hull. The defendant undertook to show that he had, in good faith, instructed all of his employes that they were not to sell oleomargarine, except it were first stamped or labeled as required by the statute, and that this sale was made by one of his employes authorized to make sales, but that he was in ignorance of the fact, and, so far as he was concerned, it was in violation of his will and his express instructions.

Now it will be noted that this prosecution here is not for adulterating food, but for selling oleomargarine without stamp-

ing it or labeling it, as required by law; and it will be remembered that it is not unlawful in Ohio to sell unadulterated oleomargarine; that it is quite as lawful, providing the regulation as to stamping it is observed, to sell oleomargarine as it is to sell sugar, silks or cotton, or other merchandise. There is certainly by the law no more inhibition against or disfavor shown to the keeping for sale and selling of this article than there is the keeping for sale and selling of intoxicating liquors. The penalties for unlawful sales are not so heavy. Nevertheless, it is made a crime to sell oleomargarine, unless the label is put upon the package. It is not made a crime to keep it without a label upon it, but it is made a crime to sell it without labeling it. Therefore, the vendor may lawfully keep it in his possession, with the purpose of selling it, and that does not thereby violate the law. He need not label it until he comes to make the sale; and, therefore, he may keep it in bulk, as I take it from the evidence was done in this case; so that when a person applies to buy, such quantities may be sold, whether a pound, two pounds, or more or less, as the person applying for the article desires; and after the package is made up of the quantity desired, before it goes out of the possession of the seller, it must be labeled.

It seems to me that the principle laid down in the case of *The State* v. *Kelly,* 54 Ohio St., 166, does not reach this case, for an entirely different principle is there involved; and it is significant (though my associates seem to think that the court there was departing from principles announced in well considered cases that have stood the test of years and are the settled law of the state) that the court there does not refer to any of those cases, does not criticize them, does not reflect upon them or indicate any purpose to depart from them at all; and, in my opinion, it was not the purpose of the court to do so, and the court has not done so, but the decision in the case of *The State* v. *Kelly, supra,* is entirely consistent with the principles of the criminal law theretofore announced by the Supreme Court in the cases referred to by my brother in stating his views of this case. In this case, we have not, as we have in *State* v. *Kelly, supra,* a question of *scienter,* or guilty knowledge; neither have we a case presenting a

question of the purpose with which the goods were sold. But we have simply the question: Did the defendant do the act? The defense, as I understand it, goes to that question. The defendant undertakes to show that he did not do the act. Of course it would not be sufficient to show that he had simply given secret instructions to the clerk; nor would it be sufficient to show that he had given public and notorious instructions to the clerk not to sell unless he observed the law. The defendant must convince the jury that he has, in good faith, forbidden and tried to prevent sales, except as authorized by law. The jury must so find, in order that the defendant shall be exonerated, and that the defendant here undertook to prove, but he was not permitted to do it. We have simply the question whether the defendant had a right to undertake to show, as indicating his innocence, that he had, in good faith, instructed his clerks to not sell this article, except when labeled according to law; whether he had a right to offer evidence to prove that he had, in good faith, forbidden them to sell it otherwise. Therefore I feel that I am not called upon to express any opinion upon what the evidence indicates as to the real knowledge or purpose of the defendant in the case upon this point and issue, which was not permitted to go to the jury.

We have all looked for authorities with considerable diligence along this line of agency; we have found some which seem to me to be directly in point; we have found none except such as hold that if the defendant shows that he has in good faith instructed or directed his agents, and they violated the law in opposition to his will, he can not be convicted. In other words, that where there is another free moral agent intervening to defeat his will and purpose, and that other free moral agent does the act, it is not the act of the defendant, and to punish the defendant is to punish him for the act of another; a result which, I declare, with all due respect for those from whom I differ, seems to me to be obnoxious and abhorrent to the sense of justice of the average man. I read from Bishop's New Criminal Law, Section 218:

"By general doctrine, it is no crime for a man to employ a servant in a lawful business; and, if the servant commits a

crime therein, the master is not liable. But we shall see further on that the master may be so careless in selecting his servant as to become answerable criminally for acts done in the service. And it appears from some of the older books that a sheriff is indictable for a mere negligent escape suffered by a deputy; for example, his jailor; because he 'ought to put in such a jailor as for whom he will be answerable.' But we may doubt whether in this sort of a case the doctrine of responsibility would be carried so far now, in the absence of special circumstances; and it seems in a general way to be settled that he can not be held criminally for the conduct of his deputy,. though he may be liable in proceeding *quasi* criminally, for the enforcement of civil rights. Further to illustrate, * * * "Section 219. In Liquor Selling.—Under the statutes forbidding the sale of intoxicating drinks without license, and the former ones against selling goods to slaves without the consent of their masters, it is sufficient in defense that the sale was made by the defendant's clerk, unauthorized either absolutely or by implication. And it is the same though the statutory words are 'by agent or otherwise.' Still we have cases in liquor selling which carry the liability of the employer very far."

Cases are there cited, to some of which I will refer briefly; the case of *Hipp* v. *The State,* 5 Blackford, 149, Supreme Court of Indiana. The syllabus of that case is as follows:

"The general rule is, that a master is liable in a *civil suit* for the negligence or unskillfulness of his servant, when he is acting in the employment of his master; but that he is not subject to be punished by indictment for the offenses of his servant, unless they were committed by his command or with his assent."

In the case of *The State* v. *Dawson,* 2 Bays, 360, the Supreme Court of South Carolina holds:

"Upon an indictment for trading with a negro, with a ticket from his master or person in whose charge he was, contrary to the act of the Legislature in such case provided. Verdict: Guilty. Motion for a new trial.

"On the trial of this case at Georgetown, it appeared that the defendant kept a small retail store in the neighborhood, and that the prosecutor's negro had been seen carrying corn to this store, and *delivering it to a clerk,* who had the care of the store.

"The Attorney-General then contended that the evidence had brought the defendant clearly within the meaning of the act,

which declares 'that if any shopkeeper, trader, or other person, shall at any time after the passing of the act, by himself *or any other person,* directly or indirectly, buy or purchase from any slave in *this* state any corn, rice, peas, or other grain, bacon, flour, tobacco, cotton, indigo, blades, or any other articles whatsoever, or shall deal, trade or traffic with any slave whatever, not having a ticket or permit so to deal, trade or traffic, or to sell any such article, from the master or owner of such slave, or such other person as may have the care and management of such slave, every such person, shopkeeper and trader shall, for every such offense, forfeit a sum not exceeding two hundred dollars, to be recovered by bill, plaint or indictment, one half to the informer, and the other moiety to the state, in any court of competent jurisdiction in the same.

"The Attorney-General then argued, that, although the evidence had not proved that the defendant himself had received the corn, yet it was delivered to his clerk or storekeeper, who was defendant's agent, and therefore it was presumable he had defendant's orders for it, and consequently that he was chargeable under this indictment."

Then the arguments upon the other side are given.

"The presiding judge (Waites) told the jury that he thought the evidence not sufficiently strong to convict the defendant, without some knowledge of the fact had been brought home to him, or some general order or direction had been proved to have been given to his clerk for that purpose."

The verdict was guilty, and the *per curiam* is as follows:

"There ought to be a new trial in this case, as there is no knowledge of this fact brought home to the defendant, nor any general directions proved against him; and, although the prosecution might be maintained against the clerk who received the corn, yet there is no proof to charge the defendant, as was very properly laid down by the presiding judge on the trial."

Another case that has been referred to and commented upon somewhat by my associate is that of *Barnes* v. *State,* 19 Conn., 398. I again call attention to that case, because it is a case that seems to be cited in the text books generally and a case which seems to have received the approval of law writers and of courts, and especially because it has received the express approval of the Supreme Court of the state of Ohio in the case of

*Anderson* v. *The State,* in the 22d Ohio St., 305; and in this connection I mention a fact to which my attention had not been drawn until my associate began or was in the course of the delivery of the opinion here, namely, that notwithstanding it is evident that in the state of Massachusetts, ignorance of the quality of the liquor sold—that is to say, as to its alcoholic or intoxicating quality—is no defense, yet it is distinctly held in the state of Massachusetts, as being entirely consistent with that doctrine, that it is a defense to show that the act was done by an agent and in opposition of the will or direction of the employer; so that I think the two doctrines are not at all obnoxious, the one to the other. Now the syllabus of this case has already been read, and I desire to read briefly from the discussion by Ellsworth, Judge, and while it has been indicated that there was a dissenting opinion, that which is approved by the Supreme Court of Ohio is the opinion of the majority, and not the dissenting opinion. I read from *Barnes* v. *State, supra,* 405:

"But in another ruling of the court we are constrained to say that there is error. The accused (a statute witness) was offered to testify that the sale was made without his consent, and contrary to positive instructions given to his clerk, by whom the sale was made, if made at all. The accused insists that the word 'agent' shall be taken in its common acceptation; that the relation of principal and agent is a matter of *fact* to be left to the jury, and not an inference of law for the court. If he is right, the testimony should have been received, as conducing to prove there was no agency in fact. The true inquiry, then, is, what does the statute mean by the term 'agent?' A just interpretation must be our guide. If construed either way, it will not, we think, exceed the power of the Legislature, though we should be induced, from necessity only, to put upon a common word an uncommon and technical meaning, particularly in the construction of a penal statute. It certainly does not mean that a person is another's agent in every transaction, because he sustains towards him that general relation. Nor does it mean every one who professes to represent another; nor every one who acts as clerk of another in his shop, or office, or business; nor every one who sells liquor on his employer's premises, without, and contrary to, his instructions. Obviously courts can attach no other than the usual meaning to the word 'agent,' unless unequivocally forced to by it, the clear language or con-

struction of the statute. An agent is an actual *bona fide* representative of his principal, in the particular transaction, with his consent or concurrence. What shall be sufficient evidence of it in any case does not belong to the present inquiry; the relation must be made out by proof, more or less particular, according to the circumstances. We speak only of criminal cases, for we admit that in civil matters, to prevent imposition or fraud, the relation of principal and agent is assumed by courts to exist where it does not, in truth, exist. We are confident this statute has not introduced a new principle of law into our criminal code; but this word 'agent' is used in order to guard against a too technical construction of a criminal statute; a caution not really needed in this case, but very natural with such men as make our laws.

"Besides, it must be remembered, that selling spiritous liquor is, generally, a *lawful* business; it becomes unlawful only in particular cases. A grocer, a druggist, a physician, may sell it for medicinal purposes, and for other purposes if it is not to be drunk on the premises, and is not sold to common drunkards and persons addicted to habits of intoxication. Within these limits, he may direct his clerk, student or servant to act for him, and forbid him to go further. The sincerity of the order must be judged of by the jury; it *may be sincere* and proper, and might have been in this case; at any rate, we can not say, that *per se* it *must* have been otherwise.

"In *Commonwealth* v. *Nichols,* 51 Mass. (10 Metc.), 259, 262, 263, the Supreme Court of Massachusetts, in a prosecution on their statute for selling spirituous liquors, hold this language: 'We think that a sale by a servant, in the shop of the master, is only *prima facie* evidence of such sale by the master as would subject him to the penalty for violating the statute forbidding the sale of spirituous liquors without license; that the relation of these parties; the fact that defendant was in possession of the shop, and was the owner of the liquor, and that the sale was made by his servant, furnish strong evidence to authorize and require the jury to find the defendant guilty. But we can not say that no possible case can arise in which the inference from all these facts may not be rebutted by proofs; unexplained, they would be sufficient to convict the party. So, too, it should be understood, that merely colorable dissent, or a prohibition not to sell, however, publicly or frequently repeated, if not made *bona fide,* will not avail. But if a sale of liquor is made by the servant, without the knowledge of the master, and really in opposition to his will, and in no way participated in, approved or countenanced by him, and this is clearly shown by the master, he ought to be acquitted.' "

The case contains some further discussion and citation of authorities.

Now the language of the Supreme Court of Ohio in the case of *Anderson* v. *The State*, 22 Ohio St., 305, is very much like that used in these cases, and *Barnes* v. *The State, supra,* and *Commonwealth* v. *Nichols,* 51 Mass. (10 Metc.), 259, are cited with approval by the Supreme Court of Ohio in that case. In *Anderson* v. *State, supra,* the statute which the Supreme Court had under consideration used the language "whoever sells by agent or otherwise," and Chief-Justice White says:

"To bring the person within the operation of the act, the elements which constitute the offense must attach to him. *He* must make the sale. It is immaterial whether he does it directly or indirectly. The object in using the phrase, 'by agent or otherwise' was to show expressly and unequivocally that the act was intended to embrace every means that the person charged might employ in effecting the illegal sale..

"The rule as to the conclusive effect of the *prima facie* or apparent authority of an agent ought not to be applied to the enforcement of a criminal statute where such statute is fairly susceptible of a different construction. The accused in such case has the right to rebut the presumption of *prima facie* agency which the evidence makes against him by showing, if he can, that the criminal act was, in fact, committed without his authority and against his instructions.

"Strictly speaking, the legal relation of principal and agent does not exist in regard to the commission of criminal offenses. All who participate in the commission of such offenses are either principals or accessories. In offenses less than felony all are principals. But when it in fact appears that the person accused in no way participated in the commission of the criminal act, he ought not, by construction, to be made punishable for it.

"Of course, the directions to the clerk or agent forbidding the sale must be in good faith to be of any avail. For, however notorious or formal such directions may be, they can have no effect if they are merely colorable. The fact of agency is to be determined by the *real understanding* between the principal and agent."

If the employer may be held accountable criminally for infractions of this law by his employes, notwithstanding the *bona fide* instructions and efforts of the former to prevent unlawful

sales, then he is so much at the mercy of his employes that if one of them should purposely disregard his instructions and violate the law with a malicious purpose of getting his employer into trouble, that fact could not be shown for the purpose or with the effect of exonerating the employer. I repeat, such results are not in harmony with the spirit of fairness and the humane principles permeating our criminal law.

Now, as I have said, it seems to me that in the case of *State* v. *Kelly, supra,* there is no departure by our Supreme Court from well settled principles respecting the question of *scienter* in prosecutions for violations of statutes respecting the adulterating of food, and that there is no indication of any purpose to depart from, or to qualify the rule laid down by the Supreme Court in the case of *Anderson* v. *The State, supra.* And, for my part, upon a mere apprehension of what the Supreme Court might possibly do, I am not willing to decide contrary to what I understand to be at present the express holding of the Supreme Court of Ohio.

Therefore, I dissent.